UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SAG HARBOR ADVISORS INC. and
JAMES SANFORD,

               Plaintiffs,

  v.

SMART CITY CAPITAL LLC,

               Defendant.
-----------------------------------------------------------------X

**MEMORANDUM OF DECISION WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW**

20-CV-5443 (LGD)

**LEE G. DUNST,** Magistrate Judge:

Plaintiffs Sag Harbor Advisors Inc. ("SHA") and James Sanford (with SHA, "Plaintiffs") assert claims against Smart City Capital LLC ("SCC" or "Defendant") for breach of contract, quantum meruit, and unjust enrichment, based on a 2019 letter agreement between the parties. *See* Electronic Case File Number ("ECF No.") 1-1 ("Compl.").

On September 18, 2023, on consent of the parties, this case was assigned to the undersigned for all purposes. *See* ECF No. 55. The Court held a bench trial on three consecutive days—April 22, 2024, April 23, 2024, and April 24, 2024. Now, based on the Court's evaluation of the trial testimony—including the credibility of the witnesses—and the evidence introduced at trial, the Court issues the below findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure ("FRCP") 52(a)(1).

For the reasons set forth herein, the Court concludes that Plaintiffs have failed to meet their burden of proving their claims by a preponderance of the evidence.

**I.    FINDINGS OF FACT**

The parties stipulate that a binding written agreement was entered into between Plaintiffs

and Defendant on December 19, 2019, in the form of a letter that is less than two pages in length. *See* ECF No. 66 at 5 ("Pretrial Order"); Plaintiffs' Exhibit C ("Letter Agreement").[1] The parties also stipulate that Defendant attempted to renegotiate the Letter Agreement per a letter dated July 23, 2020. *See* Pretrial Order at 5; Pl. Ex. M. Furthermore, the parties stipulate that Defendant purported to terminate the Letter Agreement pursuant to a notice of termination letter dated September 10, 2020 ("Termination Letter"). *See* Pretrial Order at 5; Pl. Ex. O.

The terms of the agreement, the intent of the parties, the performance through termination in September 2020, and any potential damages were the key disputed issues explored at the bench trial with the testimony of three witnesses and the introduction of twenty-five exhibits.

A.  **The Parties**

Mr. Sanford is the owner of SHA, which provides financial advisory services and helps raise capital for various types of projects. *See* Trial Transcript ("Tr.") at 4. He has thirty years of financial experience having been involved in types of complex securities and transactions including derivatives, corporate bonds, and real estate. *See id.* at 66.

Oscar Bode is the Chief Executive Officer of SCC with thirty years of experience in financing various types of projects including leasing, structured debt, and technology. *See id.* at 166. SCC helps raise capital and financing and connects investors with municipalities in their "smart city" projects.[2] *See id.* at 166-68.

---

[1] Citations hereinafter to "Pl. Ex." or "Def. Ex." refer to exhibits introduced by either Plaintiffs or Defendant and were admitted by the undersigned during the trial.

[2] A "smart city" is a municipality that has "developed technological infrastructure that enables it to collect, aggregate, and analyze real-time data to improve the lives of its residents." "Smart city projects" are infrastructure projects that make a city become more of a "smart city." Types of projects that could be considered "smart city projects" include transportation congestion and waste management sensors, water and wastewater monitoring, LED lights that are weather adaptive, solar panels, and parking apps and kiosks. *See* National League of Cities, Smart City Development, https://www.nlc.org/resource/smart-city-development/ (last visited August 8, 2024).

### B. December 20, 2019 Letter Agreement

After several meetings between Mr. Sanford and Mr. Bode in 2019, the two parties entered into a two-page letter agreement whereby SHA "could provide [SCC] a valuable partner in raising debt and equity capital for [SCC's] pipeline of telecom infrastructure partners." *See id.* at 11; Pl. Ex. C. Mr. Sanford drafted most of the Letter Agreement, and it was marked up by both he and Mr. Bode. *See* Tr. 11-12, 99. Mr. Bode testified that Mr. Sanford drafted the majority of the agreement, but both parties agreed that Mr. Bode added the termination clause to the letter. *See id.* at 118, 171.

Mr. Sanford (as the owner of SHA) was required to perform certain services for SCC. Mr. Sanford was to prioritize certain SCC deals based on direction from Defendant. *See* Pl. Ex. C. Some of his duties included (1) traveling and attending meetings, and (2) providing or obtaining support letters[3] for certain projects, at Defendant's direction. *See id.* Plaintiffs also would be responsible for managing investment banking relationships. *See id.*

Plaintiffs could be compensated in two ways for these services. *See* Pl. Ex. C. First, as a "1099 employee" (*i.e.*, independent contractor), Mr. Sanford would receive $85,000 annually, "which would be structured as a 'draw' against future success fees on capital raises for various projects." *Id.* Mr. Sanford testified that he understood "draw" in this context to mean that he would be paid an upfront monthly retainer and if there was a success fee paid to SCC on a project, then his annual retainer of $85,000 would be deducted from the amount of the success fee he was paid. *See* Tr. at 101.

The other way that Plaintiffs could be compensated would be from success fees derived from certain SCC projects. *See* Pl. Ex. C. Plaintiffs would be paid a certain percentage of the

---

[3] A "support letter" is an official correspondence from an investor that indicates whether they are interested and want to engage in discussions to finance a particular project. *See* Tr. at 32.

"fees collected by [Defendant]" with different percentages depending on the extent to which Plaintiff was involved in a certain project. *Id.*; *see also* Tr. at 15-18. Mr. Sanford testified that he understood "fees collected by [Defendant]" to mean that if Defendant did not collect any fees, then he "wouldn't get paid either." Tr. at 110. The Letter Agreement identified certain projects for which Plaintiffs could be compensated, including "Miami Dade" and "Wellness Telecom Facility." *See* Pl. Ex. C (Schedule A); Tr. at 21-22. The success fees "would be paid after recovery of the $85k salary." Pl. Ex. C.

The letter included a provision that detailed the length of the agreement and provided a mechanism for termination:

> Term: A minimum of 12 months, with termination subject to 12-month notice, with exception for termination by "cause" i.e. felony arrest, inability to perform tasks, etc. Inclusive in this 12-month term is an evaluation or probationary period of 90 days during which time [Defendant] will work under the terms of this agreement, however, the full termination clause will take effect on day 91 of the term and will continue through day 365 of this agreement. Regardless, only the termination is subject as all transactions engaged from day one will follow the above success fee basis. If the 90 day termination is exercised by [Defendant], [Plaintiffs] will continue to be compensated, as described above, on all deals where [Plaintiffs] ha[ve] already begun marketing and engagement with clients.

Pl. Ex. C at 1-2. The parties dispute the meaning of numerous portions of this provision.

As to the third sentence ("Regardless, only the termination is subject as all transactions engaged from day one will follow the above success fee basis"), Mr. Sanford testified that he understood that as long as he put any effort into a deal—*i.e.*, introducing clients and offering some value—he would be paid success fees, regardless of when the project actually closed (even, for example, ten years later) and regardless of whether Plaintiffs were terminated "for cause" or not. *See* Tr. at 19, 118, 126-27. Additionally, Mr. Sanford understood the reference to "inability to perform tasks" to be limited to "if I'm ever in a hospital and incapacitated and unable to perform my job, physically impaired." *Id.* at 118. He claimed that this clause "was very

4

narrowly defined." *Id.* He thought that the "for cause" section was only for "extreme examples" referring to "incarceration of hospitalization." *Id.* at 120. He also testified that if one party "significantly breach[ed]" the agreement such as "just stop working, no longer putting effort into the business" than that would also be considered "for cause." *Id.* at 121.

Mr. Bode, however, testified that "for cause" is a "standard termination term," which includes "inability to perform tasks" and "if you are hired to do a specific outcome or job and you can't do that task . . . [or] you mispresented something." *Id.* at 190. He understood the "12-month notice" clause as allowing him to terminate Plaintiffs for convenience, in the event of termination not for cause, "if [Defendant] for whatever reasons [did not] want to work with Mr. Sanford, but it's not for cause, then we would have to do that - - make sure that he's paid the 12 months." *Id.* at 191. Therefore, according to Mr. Bode's understanding, Defendant had to provide Plaintiffs with twelve months' notice that he was terminating the contract if the reason for termination was for "convenience" and not "for cause." *Id.* at 192. Mr. Bode also testified that he was unclear how exactly the provision would work logistically, but that Plaintiffs would not be entitled to success fees "in perpetuity." *Id.* at 193. He testified "[t]hat's not a typical concept. So it can't be forever. That doesn't exist in any industry." He further testified that, based on his understanding, if Plaintiffs were terminated "for cause," "there's nothing else owed, not just no success fees, no salary, nothing." *Id.* at 194.

C. **Performance and Termination**

On July 23, 2020, Mr. Bode sent a letter to Mr. Sanford attempting to renegotiate the Letter Agreement. *See* Pl. Ex. M. In the letter, Mr. Bode wrote that "it is clear that the original agreement would result in a structure that does not set SHA or SCC for success, thus requiring a termination for cause, given the inability to perform." *See id.* at 1. Despite the alleged inability to perform, Mr. Bode attempted to execute "an updated agreement that better aligns to the actual

5

scope and respective related success based fees, more effectively." *See id.* In the letter, Mr. Bode concluded by reaffirming his intent "to end up with a workable solution for all, instead of termination for cause." *See id.* Among the key provisions this letter attempted to change were the success fees provision—which would become more delineated between different types of projects—and the "Term" provision—which would now define "cause" as "includes but is not limited to felony arrest, inability to perform tasks, inadequate performance, or lack of productivity reasonably determined at the sole discretion of SCC." *Id.* at 3. Mr. Sanford testified that this renegotiation attempt came as a complete surprise. *See* Tr. at 45. Mr. Sanford did not accept the new proposed terms. *See id.* at 44.

On September 10, 2020, Mr. Bode sent a letter to Mr. Sanford terminating the December 20, 2019 agreement. *See* Pl. Ex. O. The Termination Letter cites three reasons for termination: (1) Plaintiffs' inability to perform the primary role; (2) Plaintiff's failure to provide support services; and (3) Plaintiffs' character issues and conflicts of interest. *See id.* The Termination Letter stated that Plaintiffs' "primary role has been a material failure . . . [as] [n]ot one single greenfield[4] equity source has been provided that has resulted in actual project funding, a term sheet or even a LOI [letter of intent]." *Id.* Additionally, the Termination Letter stated that Mr. Sanford did not provide "support in the preparation of pitch decks and related analysis" and that he "missed required conference calls." *Id.* Finally, the Termination Letter stated that Mr. Sanford would pitch his own projects, which were unrelated to Defendant's business, on Defendant's time using Defendant's resources which would "clearly confuse[]" potential funders and would harm Defendant's reputation. *Id.*

Plaintiffs dispute the allegations made in the Termination Letter. Mr. Sanford testified

---

[4] "Greenfield," in this context, means infrastructure from the ground-up, with no existing obligations or cash-flow generation. *See* Tr. at 68.

6

that he did introduce and provide some greenfield funding sources, including the CIFI Wellness project. *See* Tr. at 132, 135-36. However, he did not recall if he sourced them through his own contacts or through Defendant's contacts. *See id.* at 133. He testified that he "believed it was research [he] had done on [his] own . . . through contacts of mine" but that it was "possible that [Defendant] had a preexisting relationship as well." *Id.* at 133-34. Plaintiffs also offered the testimony of Rahul Bhardwaj, a former SCC employee and now a current business partner of Mr. Sanford, who testified that Mr. Sanford "was very interactive and brought a lot of expertise and credibility." *Id.* at 332. Mr. Bhardwaj testified that Mr. Sanford brought "the core knowledge, the institutional knowledge and the actual facts" that go into a presentation even if he did not physically put the presentations together himself. *Id.* at 340-41. Finally, Mr. Sanford disputed the claims in the Termination Letter that he harmed Defendant's business or had any conflicts of interest, especially because he was considered an independent contractor and not a SCC employee. *Id.* at 52-53.

However, Plaintiffs and Defendant presented some conflicting testimony on these issues. In fact, when the Court directly asked Mr. Sanford whether this statement from the Termination Letter—"[n]ot one single greenfield equity source has been provided that has resulted in actual project funding, a term sheet or even a LOI"—was true or false, Mr. Sanford could not provide a clear and direct answer. *See id.* at 135-36. In response, Mr. Sanford testified that he "believe[s] a lender had provided the term sheet on this CIFI Wellness" project but, in terms of other projects "there was not enough time to get to a term sheet or LOI." *Id.* Additionally, Mr. Sanford admitted that it was Mr. Bode who obtained support letters that ultimately helped Defendant secure certain projects. *See id.* at 138-39. Further, Mr. Bode testified that Mr. Sanford missed meetings and failed to help prepare materials. *See id.* at 209-10. On cross-

7

examination, Mr. Bhardwaj conceded that he did not work with Mr. Sanford day-to-day on certain projects and could not be certain whether or not Mr. Sanford missed meetings. *See id.* at 346-47. Finally, Mr. Bode testified that Mr. Sanford brought up a project unrelated to Defendant's projects at two separate meetings with potential investors. *See id.* at 214-15. Mr. Bode also testified that Mr. Sanford used his other business's email address for projects and business involving Defendant. *See id.* at 215.

Regarding the annual compensation due to Mr. Sanford, it remains unclear, based on the limited testimony and absence of supporting exhibits, how much Mr. Sanford actually was paid and the basis for his additional claims. Mr. Sanford testified that he received a monthly payment from January 2020 up to and including the final payment in September 2020. *See id.* at 160-61. According to his testimony, this totaled $57,000. *See id.* at 161. In this lawsuit, Mr. Sanford is seeking $70,833, which apparently is ten months of the $85,000 annual payment. *See id.* at 163. However, there are no exhibits to establish what Mr. Sanford was actually paid from January 2020 through September 2020 and there is no explanation or theory as to why or how Mr. Sanford is entitled to an additional ten months of compensation.

### D. Claimed Deals Entitling Plaintiffs to Success Fees

Plaintiffs cites two deals for which they claim they are entitled to success fees: Miami-Dade and CIFI Wellness. Plaintiffs seek $7,400,000 in success fees from the Miami-Dade deal and $93,000 from the CIFI Wellness deal.

#### 1. Miami-Dade

The Miami-Dade project involved smart lighting for Miami-Dade County in Florida whereby the current lighting and other infrastructure would be replaced by more efficient and environmentally friendly solutions. *See id.* at 10. Mr. Bode and SCC had already been working on the project prior to when Plaintiffs and Defendant entered into their agreement. *See id.* On

8

May 1, 2020, SCC submitted a proposal to Miami-Dade (Pl. Ex. F), in which Mr. Sanford claimed that he helped to obtain possible investors and financing for the project. *See* Tr. at 25-27. Eventually, SCC was awarded the project by Miami-Dade County. *See id.* at 225. The final date of the award, which could trigger any contractual obligation, is in dispute.

Certain key dates are undisputed and are supported by the limited exhibits and testimony. On May 14, 2021, Mr. Bode signed a contract between Miami-Dade and SCC. *See* Def. Ex. E at 45. On June 30, 2021, the Mayor of Miami-Dade recommended awarding the contract to SCC, pending the Board of County Commissioners' approval. *See* Pl. Ex. V; Pl. Ex. X at 1 ("It is recommended that the Board of County Commissioners (Board) approve a competitive contract award."). The Mayor's recommendation also lifted the "cone of silence" on the award, allowing SCC to publicly disclose the contract award recommendation. *See* Pl. Ex. W. It was not until November 17, 2021, when the Mayor signed the contract, which explicitly stated an execution date of December 20, 2021. *See* Def. Ex. E at 45.

Furthermore, Mr. Bode testified that SCC, as of the date of the trial, had not collected any fees from the Miami-Dade project. *See* Tr. 238-39. Importantly, Plaintiffs did not present any evidence, whether through testimony or exhibits, that Defendant had received any fees regarding the Miami-Dade project.

### 2. CIFI Wellness

The CIFI Wellness project involved a manufacturer of smart lighting technology and a goal to institute smart lighting and energy-efficient light bulbs in different municipalities in Latin America. *See id.* at 38. Plaintiffs presented evidence that Defendant had agreed to a success fee of $93,000 to be paid to Plaintiffs. *See* Pl. Ex. L at 4. However, Mr. Bode testified that SCC never closed the CIFI Wellness project and thus he did not receive any money from the project. *See* Tr. at 224. Importantly, Plaintiffs did not present any evidence, whether through testimony

or exhibits, that Defendant ever collected fees on the CIFI Wellness project.

## II. LEGAL STANDARDS

### A. Standard of Proof and Credibility Assessments

The burden of demonstrating a preponderance of the evidence "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993)).  Under that standard, "the party with the burden of proof would lose in the event that the evidence is evenly balanced." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 731 (2d Cir. 2001); *see United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) ("The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses.").

After a bench trial, it "is within the province of the district court as the trier of fact to decide whose testimony should be credited.  And as trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (internal quotations and citations omitted).  Similarly, following a bench trial "the weight to be given to particular pieces of evidence" is "peculiarly within the province of the [judge as] trier of fact" and these determinations are "entitled to considerable deference." *Cont'l Ins. Co. v. Lone Eagle Shipping (Liber.)*, 134 F.3d 103, 104 (2d Cir. 1998).

### B. Breach of Contract

"To support a claim for breach of contract under New York law, the plaintiff must establish: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Am. Empire Surplus Lines*

*Ins. Co. v. Concord Restoration Inc.*, No. 20-CV-2341, 2023 WL 9289062, at *4 (E.D.N.Y. Mar. 24, 2023) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).[5]

### C. Quantum Meruit and Unjust Enrichment

Applying New York law, the Court "may analyze quantum meruit and unjust enrichment together as a single quasi contract claim." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005). "New York law does not permit recovery in quantum meruit, however, if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim." *Id.* (citing *Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 388 (N.Y. 1987)); *see also Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F.Supp.2d 185, 195 (S.D.N.Y. 2009) ("Courts have permitted pleading [quantum meruit] in the alternative in the face of a written agreement . . . when there is a dispute as to the agreement's validity or enforceability.").

## III. CONCLUSIONS OF LAW

It was Plaintiffs' burden to prove at trial by a preponderance of the evidence that Defendant breached the contract and that they should be entitled to damages. The Court finds that Plaintiffs failed to meet this burden on all claims.

### A. Witness Credibility

Based on the limited testimony and the limited numbers of exhibits,[6] the Court makes no finding that either Mr. Sanford or Mr. Bode was more credible than the other in their interpretation of the Letter Agreement and in their version of events. The Court, however, found

---

[5] The parties and the Court agree that the contract is governed by New York law. *See* ECF No. 83 at 12; ECF No. 84 at 14; *Mem'l Drive Consultants, Inc. v. ONY, Inc.*, 29 F. App'x 56, 62 (2d Cir. 2002) (finding that New York law applied to contract, in the absence of an express choice of law provision).

[6] Plaintiffs do not have a basis to complain about any missing documents or documents not produced by SCC because Plaintiffs never filed a motion to compel or raised any issues with Defendant's productions with the undersigned in a timely manner.

portions of Mr. Sanford's testimony to be vague and non-responsive, especially regarding key questions of interpretation and damages.

Regarding interpretation of the Letter Agreement, for example, Mr. Sanford testified to his understanding of "inability to perform tasks." On cross-examination, Mr. Sanford claimed that his "understanding is that if I'm ever in a hospital and incapacitated and unable to perform my job, physically impaired." Tr. at 118. He further explained that he thought the "for cause" clause was "very narrowly defined" and only referred "to extreme scenarios." *Id.* However, the Court is unpersuaded that a reasonable interpretation of the phrase "inability to perform tasks" is so limited to only physical impairment (as claimed by Plaintiffs), especially where nothing regarding physical impairment or hospitalization is mentioned anywhere in the Letter Agreement, and where the entire "for cause" section is drafted very broadly.

As to potential damages, Mr. Sanford had trouble answering direct questions from the Court regarding his annual compensation. He testified that he received $57,000 of the $85,000 in 2020, but that he seeks an additional $70,833—which roughly equals ten months of compensation. The Court then inquired how he got to that number, and he said, "I'm taking ten months out of 12, ten divided by 12 times $85,000." *See* Tr. 163. From the Court's perspective, however, it is unclear from Mr. Sanford's testimony and from his pretrial and post-trial briefing how or why he seeks ten months of compensation. *See* ECF No. 84. Furthermore, Plaintiffs submitted no exhibits to support this claim (other than the Letter Agreement itself).

There also were some inconsistencies during Mr. Sanford's testimony. For example, on direct examination, Mr. Sanford testified that he understood that the projects he would be working on under the agreement had "very, very long lead times" and that he should be paid on those deals "whenever they closed." Tr. at 19. On cross-examination, however, he admitted that

12

"we [Mr. Bode and Mr. Sanford] expected to close deals sooner than [two years]." *Id.* at 103. Mr. Sanford also testified that he provided "a lot of input and added value in introducing clients to the project, which [SCC] used in his RFP response [to Miami-Dade], mainly the Carlyle Group, which is a major investor. It would have a significant impact in the decision-making process of municipality [sic] in awarding that RFP." *Id.* at 107. However, when asked directly by the Court whether the mere mention of a financial institution in the pitch letter or the actual support letter signed by a financial institution would be more important to a municipality, Mr. Sanford testified that the actual letter of support would be more impactful. *See id.* at 138.

The Court is also skeptical about the credibility of Plaintiffs' other witness, Mr. Bhardwaj, and whether he is sufficiently disinterested for the Court to rely upon his testimony. Although Mr. Bhardwaj testified to Mr. Sanford's experience and work at SCC, the Court notes that, as of this decision, Mr. Bhardwaj and Mr. Sanford are two of four partners in business together, after having been colleagues at SCC. *See id.* at 354. Additionally, Mr. Bhardwaj, as of this decision, is a named defendant in a federal court case pending in Florida, where SCC is suing Plaintiffs and Mr. Bhardwaj. *See id.* at 355. Finally, Mr. Bhardwaj resigned in November 2020 from SCC because he could not agree with the direction that SCC was going in at the time and he felt that "things would get, you know, progressively worse." *Id.* at 371.

### B. Weight of the Evidence

#### 1. Breach of Contract

Plaintiffs have failed to prove by a preponderance of the evidence three of the four elements of their breach of contract claim.[7]

---

[7] There is no dispute regarding the first element of a breach of contract claim—the existence of a contract. The parties stipulated to that fact. *See* ECF No. 66 at 5.

13

          a)       Performance

Plaintiffs have failed to prove that they adequately performed the Letter Agreement. A critical piece of testimony came when Mr. Sanford could not give a clear and direct response to the allegation in the Termination Letter that "[n]ot one single greenfield equity source has been provided that has resulted in actual project funding, a term sheet or even a LOI." *See* Pl. Ex. O; Tr. at 135. At first, Mr. Sanford testified that the first part of the sentence was false and claimed that he did provide a lot of greenfield equity sources. *See* Tr. at 135. However, Mr. Sanford later testified that he believed that, as to the CIFI Wellness project, a lender had provided a term sheet, but that "there was not enough time to get to a term sheet or LOI. I wasn't there long enough. Those conversations take so long." *Id.* at 135-36. Mr. Sanford also could not conclusively say who had "sourced" CIFI Wellness—whether he had sourced the project through his own research or prior contacts or whether Mr. Bode had sourced the project through a preexisting relationship. *Id.* at 133-34. Mr. Bode, however, testified that he had sourced the CIFI Wellness project. *See id.* at 197. Mr. Bode later testified that his company was unable to close the CIFI Wellness project resulting in no term sheet, LOI, or fees awarded to SCC. *See id.* at 303. Outside of Plaintiff's own vague testimony, he did not introduce any evidence (either witnesses or exhibits) to show otherwise.

Regarding the Miami-Dade project, Plaintiffs failed to prove that they adequately performed services under the Letter Agreement. Significantly, Plaintiffs failed in their burden to show what, if anything, Mr. Sanford contributed to Defendant winning the Miami-Dade project. For his part, Mr. Sanford recalls engaging with two financial groups that Defendants listed in their original proposal for the Miami-Dade project—the Carlyle Group and Citigroup. *See id.* at 29; *see also* Pl. Ex. F at 11. However, Mr. Sanford admitted that there were no letters of support from the Carlyle Group or Citigroup and that he did not obtain the support letters (from

14

Whitehelm Capital and ING Capital LLC) that ultimately were in the proposal to Miami-Dade and were key to SCC landing the Miami-Dade project. *See* Tr. at 138, 236; Pl. Ex. F at Appx. 7. Both Mr. Sanford and Mr. Bode testified that it was Mr. Bode who obtained these support letters that were submitted to Miami-Dade. *See* Tr. at 138, 236. *Cf. Dominick & Dominick LLC v. Deutsche Oel & Gas AG*, No. 14-CV-06445, 2016 WL 11259075, at *7 (S.D.N.Y. Aug. 15, 2016) (finding that the plaintiff was not entitled to a commission or funding fee merely for listing a potential investor on a target list or did not "otherwise arrange[] any part of the resulting transaction"), *aff'd sub nom. Dominick & Dickerman LLC v. Deutsche Oel & Gas AG*, 756 F. App'x 58 (2d Cir. 2018).

Finally, Plaintiffs failed to prove that they adequately performed the part of the Letter Agreement regarding support services. Mr. Bode testified that Mr. Sanford missed key meetings with clients, including some involving the CIFI Wellness project. *See* Tr. at 210-13. Mr. Bode also testified that Mr. Sanford would sometimes pitch his own projects (not SCC deals) at meetings. *See id.* at 215. Finally, Mr. Bode testified that Mr. Sanford would not provide assistance on other projects, such as creating project teasers[8] or analytics work. *See id.* at 204. For his part, Mr. Sanford was not able to effectively counter this narrative that he was unhelpful regarding support services. Mr. Sanford testified that he did not recall missing any meetings (*see id.* at 153); however, there was no other evidence to corroborate Mr. Sanford's claim and Plaintiffs' attempt to corroborate—through the testimony of Mr. Bhardwaj—was insufficient because Mr. Bhardwaj did not work with Mr. Sanford daily on these projects, and thus, he was unable to say affirmatively whether Mr. Sanford had missed meetings. *See id.* at 346.

Because Plaintiffs have not presented enough evidence to counter Defendant's narrative

---

[8] "Project teasers," in this context, means two- to three-page documents that summarize what a project is about. *See id.* at 205.

15

and have otherwise failed to present evidence (outside of Mr. Sanford's own vague testimony) to affirmatively meet their burden, the Court finds that Plaintiffs did not prove by a preponderance of the evidence that they adequately performed the Letter Agreement. *See Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, No. 11-CV-726, 2019 WL 13277401, at *17 (E.D.N.Y. Mar. 27, 2019) ("New York law . . . places the burden of proving performance in an ordinary contract action upon the plaintiff.") (internal quotation omitted).

          b)       Breach

Plaintiffs also have failed to prove that Defendant breached the Letter Agreement as a result of the termination on September 10, 2020. The Letter Agreement allowed Defendant to terminate "for cause," such as an "inability to perform tasks." *See* Pl. Ex. C. Plaintiffs suggested that "inability to perform tasks" was limited to physically unable, such as hospitalization. *See* Tr. 116-120. However, there is no evidence in the record (aside from Mr. Sanford's own vague testimony) that can logically support this extremely narrow interpretation. *See L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation, unless each is a reasonable interpretation.") (internal quotations and citations omitted). Mr. Bode testified that he believed the clause to mean "unable to perform the work . . . or . . . you couldn't deliver what you said you could." *Id.* at 309. With competing testimony and no evidence to support Plaintiffs' interpretation, any tie goes to Defendant.[9]

---

[9] Plaintiffs attempt to shift the burden to Defendant to prove that the termination was for cause claiming that, for employment contracts, the burden shifts to the employer to prove for cause. *See* ECF No. 84 at 38-41. The Court finds that Plaintiffs argument is irrelevant because the contract was not an employment contract. *See, e.g.*, Pl. Ex. C ("James Sanford would be added as a '1099' employee of SCC"); Tr. at 12 (Mr. Sanford testifying that his understanding of "1099 employee" is "[a]n independent contract, not a W-2 salaried employee"). Moreover, Plaintiffs do not cite to a single case from New York law or the Second Circuit in direct support of its proposition (*see* ECF No. 84 at 39) and the one case they do cite from the Second Circuit goes against their position. *See PRCM Advisers LLC v. Two Harbors Inv. Corp.*, No. 20-CV-5649, 2021 WL 2582132, at *6 (S.D.N.Y. June 23, 2021) ("To state a claim for breach of contract, [Plaintiff] must allege that the purported events did not occur or were not

Additionally, under New York law, "a party is relieved of the duty to perform under a contract only when the other party has committed a material breach." *RKI Constr., LLC v. WDF Inc.*, No. 14-CV-1803, 2020 WL 6545915, at *15 (E.D.N.Y. Nov. 6, 2020). "For a breach to be considered material, 'it must go to the root of the agreement between the parties.'" *Id.* (quoting *Frank Felix Assocs. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)). As stated above, Plaintiffs did not prove that they adequately performed the Letter Agreement, in that they failed to prove (among other things) that they provided any greenfield equity source that resulted in a deal in which Defendant actually collected on fees. *See* Tr. at 135-36. This failure went to the root of the agreement, which was entered into so that Plaintiffs could "provide [Defendant] a valuable partner in raising debt and equity capital for [Defendant's] pipeline of telecom infrastructure partners." Pl. Ex. C; Tr. at 171. Thus, any alleged breach by Defendant would otherwise be excused because Plaintiffs themselves committed a material breach that went to the root of the agreement. *See Envy Branding, LLC v. William Gerard Grp., LLC*, No. 20-CV-03182, 2024 WL 869156, at *14 (S.D.N.Y. Feb. 29, 2024) (finding that because the plaintiff's breach went "to the root" of the contract it could not pursue its own breach of contract claim against the defendant).

        c)       Damages

Finally, and perhaps the biggest failure by Plaintiffs in not meeting their burden in this case, is that they did not prove that they are entitled to any damages. *See Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016) ("Proof of damages is an essential element of a claim for breach of contract under New York law."). Regarding Mr. Sanford's

---

material breaches or acts of gross negligence. While [Plaintiff] asserts generally that it [disagrees with the reasons for termination] it fails to allege that these events did not occur or that they were not material breaches or grossly negligent.").

entitlement to "missing" compensation, the Court has only the confusing testimony of Mr. Sanford who claimed that he had been paid $57,000 of the $85,000 annual payment in 2020, but that he now seeks an additional $70,833—which roughly equals ten months of compensation. *See* Tr. 163. There are no pay stubs or accounts that show what Mr. Sanford was actually paid and nothing in the record to support his request for ten months of additional payment. Furthermore, and most importantly, there is no evidence – testimony or exhibits – that shows that Defendant has collected on any fees from any of the deals cited by Plaintiffs. Even if the Court accepts (which it does not) that Plaintiffs adequately performed the duties under the contract and that Defendant breached its obligations, Defendant has not collected any success fees on the relevant deals identified by Plaintiffs. In fact, Mr. Bode testified that SCC (1) was not awarded the CIFI Wellness project (*see id.* at 303), and thus, did not collect any fees, and (2) has, to date, not collected any fees regarding the Miami-Dade project. *See id.* at 238-39. In his testimony and his submissions to the Court, Mr. Sanford did not (and could not) offer any competing evidence to the contrary.[10]

Accordingly, for the reasons set forth above, Plaintiffs have not proven by a

---

[10] The date of the Miami-Dade contract, the subject of extensive pretrial submissions and testimony, is thus irrelevant considering that Plaintiffs failed in meeting their burden to show that fees have been collected by Defendant. The Court, nevertheless, finds that the effective date of the contract – December 20, 2021 – is the controlling date that could trigger the 12-month "term" clause in the contract. *See* Def. Ex. E (stating execution date of contract as December 20, 2021). The Court rejects Plaintiffs' attempt to rely upon the earlier date of the recommendation award letter since any awarding of the contract was contingent upon the subsequent board approval. *See* Pl. Ex. U (showing SCC contract on the Board of County Commissioners' agenda for November 2, 2021); Pl. Ex. X ("It is recommended that the Board of County Commissioners (Board) approve a competitive contract award."). Further, the Court makes no finding regarding the interpretation of the "term" clause – *i.e.*, the parties' disagreement whether Plaintiff is entitled to fees collected only within a year of termination (Defendant's position) or in perpetuity (Plaintiffs' position). The Court, however, is skeptical of Plaintiffs' argument that they should be entitled to success fees in perpetuity. They provide no evidence for that interpretation nor cite any law or case for that extreme position. *Cf., e.g., Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 289 (S.D.N.Y. 2016) (finding that employee not entitled to a commission that closed post-termination); *Bravia Cap. Partners, Inc. v. Fike*, No. 09-CV-6375, 2011 WL 6081345, at *3 (S.D.N.Y. Dec. 6, 2011) ("[I]t is a well-settled principle of New York law that an at-will employee will be entitled to post-discharge commissions only if the employment agreement expressly provides for such compensation.").

preponderance of the evidence their breach of contract claim.

### 2. Quantum Meruit and Unjust Enrichment

Additionally, Plaintiffs' claims for quantum meruit and unjust enrichment should be dismissed. Both parties agree that there was an enforceable contract between Plaintiffs and Defendant. *See* ECF No. 66 at 5. It is well established under New York law that an enforceable written contract precludes recovery under quasi-contract theories such as quantum meruit and unjust enrichment, and Plaintiffs thus cannot recover under these two alternative claims. *See United States for Use & Benefit of Five Star Elec. Corp. v. Liberty Mut. Ins. Co.*, 758 F. App'x 97, 100 (2d Cir. 2018) (finding no quantum meruit claim "because the parties do not dispute the subcontract's validity or enforceability"); *BAE Sys. Info. & Elec. Sys. Integration Inc. v. L3Harris Cincinnati Elecs. Corp.*, No. 23-CV-1860, 2024 WL 520878, at *9 (S.D.N.Y. Feb. 9, 2024) (holding that an unjust enrichment claim must fail "because the parties' relationship is governed by a binding agreement").

## IV. CONCLUSION

For the reasons set forth above, the Court finds that Plaintiffs have failed to meet their burden to prove all their claims by a preponderance of the evidence.

SO ORDERED:

Dated:    Central Islip, New York
           August 16, 2024

                                                      s/ Lee G. Dunst
                                              **LEE G. DUNST**
                                              United States Magistrate Judge